ANTHONY POOLS, A DIVISION OF ANTHONY
INDUSTRIES, INC. *v.* JOHN B.
SHEEHAN ET UX.

[No. 12, September Term, 1982.]

*Decided January 25, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*John J. O'Neill, Jr.,* with whom were *Ford & O'Neill* on the brief, for appellant.

*Walter J. Murphy, Jr.,* with whom were *Welch, Murphy & Welch* on the brief, for appellees.

*Amicus curiae* brief of The Motor Vehicle Manufacturers Association of the United States, Inc. filed. *Edward S. Digges, Jr., Robert Dale Klein, Michael T. Wharton* and *Piper & Marbury* and *William H. Crabtree* on the brief.

RODOWSKY, J., delivered the opinion of the Court.

This products liability case presents questions of implied warranty and of defense to strict liability in tort involving an inground, gunite swimming pool and its diving board. Analysis of whether there is any implied warranty and, if so, whether it can be excluded takes us into the problem of hybrid transactions and into Md. Code (1975), § 2-316.1 (1) and (2) of the Commercial Law Article (CL).[1]

Plaintiffs, John B. Sheehan (Sheehan) and his wife, Pilar E. Sheehan, of Potomac Woods, Maryland, sued Anthony Pools, a division of Anthony Industries, Inc. (Anthony) in the Circuit Court for Montgomery County. Sheehan sustained bodily injuries when he fell from the side of the diving board

---

1. CL § 2-316.1 in relevant part provides:

(1) The provisions of § 2-316 do not apply to sales of consumer goods, as defined by § 9-109, services, or both.

(2) Any oral or written language used by a seller of consumer goods and services, which attempts to exclude or modify any implied warranties of merchantability and fitness for a particular purpose or to exclude or modify the consumer's remedies for breach of those warranties, is unenforceable. However, the seller may recover from the manufacturer any damages resulting from breach of the implied warranty of merchantability or fitness for a particular purpose.

of the plaintiffs' new, backyard swimming pool. The swimming pool had been designed and built by Anthony. Anthony also designed and manufactured the diving board which it installed as part of the swimming pool transaction.

The swimming pool is 16 feet by 40 feet, with a depth from 3 feet to 8 feet. Its style is "Grecian," which means that there is a curved alcove in the center of each of the 16 foot sides. The 6 foot long diving board in question was installed over an imaginary centerline bisecting the alcove at the deep end of the pool. Anthony had completed its work by mid-June of 1976. On August 21, 1976 the plaintiffs entertained at a pool party. Sheehan testified that he had not previously used the diving board. He said that on that evening he emerged from swimming in the pool, stepped up onto the diving board, and, while walking toward the pool end of the diving board, slipped and fell from the right side of the diving board and struck the coping of the pool.

Plaintiffs advanced two theories of liability. First, skid resistant material built into the surface of the top of the diving board did not extend to the very edge of the board on each side. It stopped approximately one inch short of each edge. This condition, it was claimed, breached an implied warranty of merchantability. Plaintiffs also presented testimony directed toward proving that use of the "defective" diving board, particularly as positioned in the alcove, was unreasonably dangerous.

At the end of the plaintiffs' case, the trial court directed a verdict for Anthony as to liability founded on warranty, because the written contract between the parties conspicuously provided that the express warranties which it contained were in lieu of any other warranties, express or implied. The case went to the jury on a strict liability in tort theory. Verdict was in favor of the defendant, and judgment was so entered.

Plaintiffs appealed to the Court of Special Appeals which reversed and remanded for a new trial. That court said that "the swimming pool package purchased by the Sheehans constitute[d] 'consumer goods'" so that CL § 2-316.1

rendered ineffective Anthony's attempt to limit the implied warranty of merchantability. *Sheehan v. Anthony Pools,* 50 Md. App. 614, 619, 440 A.2d 1085, 1088 (1982). The granting of the directed verdict based on the contractual limitation was held to be error. Judgment based on the jury verdict was reversed because of error in the instructions. As to that issue, Judge Moore, writing for the court, concluded:

> In the instant case, it is our view that while the trial court was eminently correct in rejecting the defendant's request for a contributory negligence instruction, the matter should not have ended there. On the basis of the facts involved and of the Sheehans' specific request, an instruction should have been granted that Mr. Sheehan's inadvertent or careless use of the diving board and the pool would not bar his recovery. On the other hand, giving such an instruction would also have required an appropriate instruction on assumption of risk *i.e.,* that the defendant was entitled to prevail if Mr. Sheehan had discovered the defect, was aware of the danger, and then proceeded unreasonably to use the diving board and pool. [*Id.* at 625-26, 440 A.2d at 1092.]

We granted Anthony's petition for certiorari which raised three questions. In essence, the petition asks us to review (1) the implied warranty issue; (2) the inadvertent use instruction issue; and (3) whether the Court of Special Appeals erred "in holding, as dictum that contributory negligence is not a defense in a strict liability case."

(1)

The warranty issue, as presented here, involves only the implied warranty of merchantability under CL § 2-314. Plaintiffs do not argue that their warranty claim is based upon any express warranty or that the diving board was to be used for other than its ordinary purpose. Anthony contends that the Sheehans' swimming pool is not "goods,"

that exclusion of implied warranties is allowed, and that a directed verdict on the plaintiffs' warranty count was proper. We agree with the Court of Special Appeals that the directed verdict was improper in this case, but we reach that conclusion by a somewhat different route.

Title 2 of the Commercial Law Article is the Maryland Uniform Commercial Code — Sales. CL § 2-101. Unless the context otherwise requires, that title "applies to transactions in goods . . . ." CL § 2-102. For purposes of title 2, and with certain exclusions not here relevant, "goods" means "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ." CL § 2-105 (1). CL § 2-314 (1) in part provides that "[u]nless excluded or modified (§ 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." CL § 2-316 (2) permits the exclusion or modification of the implied warranty of merchantability by language which mentions merchantability and which, in the case of a writing, is conspicuous. The Maryland U.C.C., in § 2-316.1, then states that the "provisions of § 2-316 do not apply to sales of consumer goods, as defined by § 9-109, services, or both," and that any "language used by a seller of consumer goods and services, which attempts to exclude or modify any implied warranties . . . is unenforceable." CL § 9-109 (1) provides that goods are " '[c]onsumer goods' if they are used or bought for use primarily for personal, family or household purposes."

The May 25, 1976 contract between Anthony and the plaintiffs is a printed form designed for use in Anthony's Washington, D.C. region. It is a single sheet of paper, approximately 15″ by 20″, with printing on both sides. The face of the document is three columns wide. The lefthand column on the face is headed "Retail Installment Contract." Under that column are set forth Anthony's contractor license numbers in Virginia, Maryland and the District of Columbia, a statement of the buyer's right to cancel a home solicitation contract, federal truth-in-lending disclosures

and a detachable notice of cancellation. The next two columns on the face are entitled "Swimming Pool Construction Agreement." Anthony "agrees to construct for and sell to" the plaintiffs, called " 'Buyer,' " the "swimming pool and related equipment described below (herein collectively called the 'work') to be installed at" the plaintiffs' home for a fixed cash price.[2] Below this covenant, under the heading "Plans and Specifications," are two columns listing 47 items, some of which are automatically included and some of which are optional. These items appear under the headings, "General Construction Specifications," "Hydraulic And Filtering Specifications," "Color-Coordinated Exclusive Deck Equip.," "Automatic Pool Equipment" and "Other Anthony Features." In the subject contract Anthony's obligations included pool layout, structural engineering, obtaining construction permits, excavation, use of engineered steel reinforcing throughout the pool structure, guniting the pool structure, finishing the pool interior with hand troweled, waterproof plaster, installation both of a six inch band of water-line tile and of coping and installation of a filter, a pump, a skimmer and a specified model of six foot diving board. The reverse side of the contract contains two columns of terms and conditions, including the implied warranty exclusion.

The subject contract presents a mixed or hybrid transaction. It is in part a contract for the rendering of services and in part a contract for the sale of goods.

*Burton v. Artery Company,* 279 Md. 94, 367 A.2d 935 (1977) addressed the applicability *vel non* of the Maryland U.C.C. — Sales to hybrid contracts. The issue presented was whether the four year statute of limitations under § 2-725(1), or the general three year statute, applied to a contract to landscape around a construction project of 13

---

2. The swimming pool construction agreement states a cash price of $7,980 while the disclosure statement lists it to be $9,489.31, before finance charge. There is no explanation in the record for this discrepancy. The contract does not itemize the portion of the fixed price applicable to any part of the work or to any item of equipment.

buildings. The contract called for the furnishing and planting of hundreds of trees, of hundreds of shrubs, and of sod. We there adopted the test enunciated in *Bonebrake v. Cox,* 499 F.2d 951 (8th Cir. 1974), a case holding that the sale and installation of bowling lanes, with associated equipment, is a contract of sale and not of services. That test is whether "the predominant factor . . . , the thrust, the purpose, reasonably stated, is a transaction of sale with labor incidentally involved," or vice versa. 279 Md. at 114-15, 367 A.2d at 946. Applying that test, the Court held the contract in *Burton* to be predominately a transaction in goods. *See also Snyder v. Herbert Greenbaum & Associates,* 38 Md. App. 144, 380 A.2d 618 (1977) (contract to furnish and install over 17,000 yards of carpet in 228 apartments was predominately a sale of goods).

G. Wallach, *The Law of Sales Under the Uniform Commercial Code* (1981), § 11.05[3] at 11-28 describes the current state of the law concerning implied warranties in hybrid transactions to be as follows:

> The general pre-Code approach to this issue was to examine the transaction to see whether the goods aspect or the service aspect of the transaction predominated. If the service aspect predominated, no warranties of quality were imposed in the transaction, not even if the defect or complaint related to the goods that were involved rather than to the services. This mechanical approach remains the most popular method of resolving the issue. [Footnote omitted.] [3]

---

3. Among recent decisions applying the predominant purpose test are: White v. Peabody Construction Co., Inc., 386 Mass. 121, 434 N.E.2d 1015 (1982) (contract for the construction of a housing project was one for services so that there was no warranty implied under the U.C.C. on the windows or frames, which leaked); Milau Associates v. North Avenue Development Corp., 42 N.Y.2d 482, 368 N.E.2d 1247, 398 N.Y.S.2d 882 (1977) (there is no warranty of merchantability on a section of pipe which ruptured and which had been installed as part of a sprinkler system in the course of construction of a new building); Northwestern Equipment, Inc. v. Cudmore, 312 N.W.2d 347 (N.D. 1981) (contract for the repair of the transmission in a used bulldozer is a contract for services and carries no implied warranty of fitness for a particular purpose, even though the charges for parts exceeded the charges for labor).

The few reported holdings concerning whether Article 2 of the U.C.C. applies to swimming pool installations have involved a variety of types of pools and are not uniform. A Connecticut trial court decision dealt with the alleged breach of the implied warranty of merchantability in the installation of an aboveground swimming pool. Its sides were plywood panels, braced by 2″ x 4″ supports. A vinyl liner was laid within the sides. That court applied the predominant purpose test. It held that the owners did not offer any adequate evidence on the apportionment between labor and material and equipment, and so they failed to meet the burden of establishing the existence of a warranty under the U.C.C. *Gulash v. Stylarama, Inc.,* 33 Conn. Supp. 108, 364 A.2d 1221 (1975). A vinyl liner pool was also involved in *Riffe v. Black,* 548 S.W.2d 175 (Ky. App. 1977). The walls of that pool consisted of prefabricated steel which was set into an excavated site. Sand was troweled for the bottom of the pool. Leaking had resulted from the contractor's failure both to reseat the liner after a wrinkle had developed during installation and to repair the hole which developed later. The Kentucky court applied a predominant purpose test and necessarily classified the contract as one for the sale of goods. It was held that the warranty provisions of that state's U.C.C. "apply to services when the sale is primarily one of goods and the services are necessary to insure that those goods are merchantable and fit for the ordinary purpose." *Id.* at 177. Judgment for the pool owners was affirmed. *Ben Construction Corp. v. Ventre,* 23 A.D.2d 44, 257 N.Y.S.2d 988 (1965) is not a U.C.C. case, but it is analogous. It presented the claim of the pool owners for return of moneys paid, based on a section of the New York Personal Property Law. The pool is described in the opinion only as "installed." Judgment for the defendant contractor was affirmed, 3-2. In the majority's view, the contract was for work, labor and services and was not a sale, while the dissent viewed the transaction as primarily a sale of a swimming pool with an incidental agreement to install.

The Court of Special Appeals has recently held that CL § 2-601's "perfect tender" provisions do not apply to a contract for the installation of an inground, concrete swimming pool. There was no transaction in goods because the pool was not movable. *Chlan v. KDI Sylvan Pools, Inc.,* 53 Md. App. 236, 452 A.2d 1259 (1982).[4]

Here, Anthony undertook the construction of an inground, steel reinforced, gunite swimming pool with hand finished plaster surfacing, tile trim and coping. The Sheehans were not buying steel rods, or gunite, or plaster or tiles. The predominant factor, the thrust, the purpose of the contract was the furnishing of labor and service by Anthony, while the sale of the diving board was incidental to the construction of the pool itself. The question thus resolves itself into whether the predominant purpose test, which we applied in *Burton* for the purpose of determining whether the U.C.C. statute of limitations governed that transaction, should be applied to determine whether the sale of the diving board, included in the Anthony-Sheehans transaction, carries an implied warranty of merchantability under § 2-314.

Were the predominant purpose test mechanically to be applied to the facts of this case, there would be no quality warranty implied as to the diving board. But here the contract expressly states that Anthony agrees not only to construct the swimming pool, but also to sell the related equipment selected by the Sheehans. The Sheehans are de-

---

4. The *Chlan* court undertook to distinguish its decision from the instant matter of the Sheehans' warranty claim against Anthony by the following rationale:

> *Sheehan,* however, involved application of the warranty sections of the MUCC, specifically § 2-316.1. Nevertheless, § 2-316.1, in extinguishing the ability of sellers to exclude or modify consumer warranties, explicitly displaces the general Title 2 definition of goods in § 2-105 with a specific reference to ". . . consumer goods, as defined by § 9-109, services, or both." The present dispute involves the interplay of various sections of Title 2 *other than* § 2-316.1 and the § 2-105 definition of goods applies. [Emphasis in original.] [53 Md. App. at 241, 452 A.2d at 1262.]

scribed as " 'Buyer' ". The diving board itself is not structurally integrated into the swimming pool. Anthony offered the board as an optional accessory, just as Anthony offered the options of purchasing a pool ladder or a sliding board. When identified to the contract, the diving board was movable. *See* CL § 2-105. The board itself remains detachable from its support, as reflected by a photograph in evidence. The diving board, considered alone, is goods. Had it been purchased by the Sheehans in a transaction distinct from the pool construction agreement with Anthony, there would have been an implied warranty of merchantability.

A number of commentators have advocated a more policy oriented approach to determining whether warranties of quality and fitness are implied with respect to goods sold as part of a hybrid transaction in which service predominates. *See* Farnsworth, *Implied Warranties of Quality in Non-Sales Cases,* 57 Colum. L. Rev. 653 (1957); Comment, *Sale of Goods in Service-Predominated Transactions,* 37 Fordham L. Rev. 115 (1968); Note, *Products and the Professional: Strict Liability in the Sale-Service Hybrid Transaction,* 24 Hastings L.J. 111 (1972); Note, *Contracts for Goods and Services and Article 2 of the Uniform Commercial Code,* 9 Rut.-Cam. L.J. 303 (1978); Comment, *Sales-Service Hybrid Transactions: A Policy Approach,* 28 Sw. L.J. 575 (1974). To support their position, these commentators in general emphasize loss shifting, risk distribution, consumer reliance and difficulties in the proof of negligence. These concepts underlie strict liability in tort. *See Phipps v. General Motors Corp.,* 278 Md. 337, 363 A.2d 955 (1976).

A leading case applying a policy approach in this problem area is *Newmark v. Gimbel's Incorporated,* 54 N.J. 585, 258 A.2d 697 (1969). There the patron of a beauty parlor sued for injury to her hair and scalp allegedly resulting from a lotion used in giving her a permanent wave. Because the transaction was viewed as the rendering of a service, the trial court had ruled that there could be no warranty liability. The intermediate appellate court's reversal was affirmed

by the Supreme Court of New Jersey which reasoned in part as follows (*id.* at 593, 258 A.2d at 701):

> The transaction, in our judgment, is a hybrid partaking of incidents of a sale and a service. It is really partly the rendering of service, and partly the supplying of goods for a consideration. Accordingly, we agree with the Appellate Division that an implied warranty of fitness of the products used in giving the permanent wave exists with no less force than it would have in the case of a simple sale. Obviously in permanent wave operations the product is taken into consideration in fixing the price of the service. The no-separate-charge argument puts excessive emphasis on form and downgrades the overall substance of the transaction. If the beauty parlor operator bought and applied the permanent wave solution to her own hair and suffered injury thereby, her action in warranty or strict liability in tort against the manufacturer-seller of the product clearly would be maintainable because the basic transaction would have arisen from a conventional type of sale. It does not accord with logic to deny a similar right to a patron against the beauty parlor operator or the manufacturer when the purchase and sale were made in anticipation of and for the purpose of use of the product on the patron who would be charged for its use. Common sense demands that such patron be deemed a customer as to both manufacturer and beauty parlor operator. [Citations omitted.]

The court was careful to limit its holding to commercial transactions, as opposed to those predominately involving professional services. *Id.* at 596-97, 258 A.2d at 702-703.

1 R. Anderson, *Uniform Commercial Code* (1970), § 2-102:5 at 209 refers to *Newmark* as illustrative of a possible trend in the law and states:

> It is probable that a goods-services transaction will come to be subjected to Article 2 of the Code insofar as the contractor's obligations with respect to the goods themselves are involved, at least where the goods involved could have been purchased in the general market and used by the plaintiff-customer.

A warranty of fitness for particular purpose under § 2-315 of the U.C.C. was implied in *Worrell v. Barnes,* 87 Nev. 204, 484 P.2d 573 (1971). In that case a contractor was engaged to do some carpentry work and to connect various appliances in the plaintiff's home to an existing liquified petroleum gas system. The appliances were not supplied by the contractor. Suit was for damage to the plaintiff's home resulting from a fire. The plaintiff produced evidence that the fire was caused by a defective fitting installed by the contractor which had allowed propane to escape. Dismissal of the plaintiff's claims, based on the Nevada version of strict liability in tort and based on implied warranty, was reversed. The court reasoned that, because it had held that the contractor had sold a product so as to bring into operation the doctrine of strict liability, "so also must we deem this case to involve 'goods' within the purview of the Uniform Commercial Code." *Id.* at 208, 484 P.2d at 576.

1 W. Hawkland, *Uniform Commercial Code Series* (1982), § 2-102:04, at Art. 2, p. 12 has suggested what might be called a "gravamen" test in light of the decision in *Worrell.* He writes:

> Unless uniformity would be impaired thereby, it might be more sensible and facilitate administration, at least in this grey area, to abandon the "predominant factor" test and focus instead on whether the gravamen of the action involves goods or services. For example, in Worrell v. Barnes, if the gas escaped because of a defective fitting or connector, the case might be characterized as one involving the sale of goods. On the other hand, if the

gas escaped because of poor work by Barnes the case might be characterized as one involving services, outside the scope of the UCC.

In this State, the provisions of CL § 2-316.1 (1) and (2) reflect an implicit policy judgment by the General Assembly which prevents the mechanical application of the predominant purpose test to cases like the one under consideration. Subsection (1) states that § 2-316, dealing in part with the manner in which an implied warranty of merchantability may be excluded or modified, does not apply to "consumer goods . . . services, or both." Under subsection (2) language "used by a seller of consumer goods and services" to exclude or modify implied warranties is unenforceable. The hybrid transaction is covered by, or at least embraced within, those terms.

Under the predominant purpose test, as applied by a majority of the courts, a hybrid transaction must first be classified as a sale of goods in order for there to be U.C.C. based, implied warranties on the goods included in the transaction. If goods predominate and they are consumer goods, § 2-316.1 would render contractual disclaimers of implied warranties ineffective because that section applies to a seller of consumer goods. In such cases the result of applying the predominant purpose test is consistent with § 2-316.1. If, however, the predominant purpose test results in classifying the transaction as a contract for services there would, under the majority approach, be no U.C.C. based, implied warranties on goods included in the transaction. But, § 2-316.1 declares that a seller of consumer services may not contractually disclaim implied warranties. In the hybrid transaction, at least one effect of § 2-316.1 is to render ineffective contractual disclaimers of implied warranties on consumer goods included in a consumer service transaction. Section 2-316.1 is at least partially predicated on a legislative understanding that warranties under the U.C.C. are implied as to the goods included in such transactions. An all or nothing classification of the instant transaction under the predominant purpose test would mean

there could be no U.C.C. based, implied warranties on the diving board and would be contrary to the legislative policy implicit in § 2-316.1. Consequently, we cannot use that test in order to determine whether U.C.C. based warranties are implied as to consumer goods in a transaction that is predominately for the rendering of consumer services.

The gravamen test of Dean Hawkland suggests the vehicle for satisfying the legislative policy. Accordingly, we hold that where, as part of a commercial transaction, consumer goods are sold which retain their character as consumer goods after completion of the performance promised to the consumer, and where monetary loss or personal injury is claimed to have resulted from a defect in the consumer goods, the provisions of the Maryland U.C.C. dealing with implied warranties apply to the consumer goods, even if the transaction is predominately one for the rendering of consumer services. The facts of the instant case, however, make it unnecessary for us presently to decide whether § 2-316.1 would require that U.C.C. based, implied warranties also extend to consumer goods which are used up in the course of rendering the consumer service to the consumer.[5]

Thus the diving board which Anthony sold to the Sheehans as part of the swimming pool construction contract carried an implied warranty of merchantability under CL § 2-314. Anthony's contractual disclaimer of that warranty was ineffective under CL § 2-316.1. As a result, the trial court erred in relying on the disclaimer as a basis for directing a verdict in favor of Anthony on the warranty count.

---

5. The reference to "services" in § 2-316.1 has been said to pose "a source of confusion." Freeman and Dressel, *Warranty Law in Maryland Product Liability Cases: Strict Liability Incognito?*, 5 U. Balt. L. Rev. 47, 61 n.97 (1975). We express no opinion as to whether today's holding, which is limited to certain consumer goods in a hybrid transaction, is co-extensive with the warranty imposing effect of § 2-316.1's reach into the area of consumer services.

(2) & (3)

The Court of Special Appeals also reversed the judgment for Anthony on the issue of strict liability in tort because of error by way of omission in instructions to the jury. That is the only question before us on this phase of the case. Because the intermediate appellate court correctly applied the principles laid down in *Phipps v. General Motors Corp., supra,* 278 Md. 337, 363 A.2d 955 concerning the conduct of a plaintiff as a defense in a case of strict liability in tort, we adopt part III of that court's opinion appearing at 50 Md. App. 614, 620-26, 440 A.2d 1085, 1089-1092.

> *Judgment of the Court of Special Appeals affirmed.*
> *Costs to be paid by Anthony Industries, Inc.*