495 A.2d 348

**Elizabeth Horton ELLSWORTH**

v.

**SHERNE LINGERIE, INC., et al.** ▮

**No. 130, Sept. Term, 1984.**

Court of Appeals of Maryland.

July 12, 1985.

582

584

586

John A. King, Rockville, for appellant.

Samuel J. DeBlasis, II, Upper Marlboro (O'Malley, Miles, McCarthy & Harrell, Upper Marlboro, on the brief), for appellee, Sherne Lingerie, Inc.

William M. Nickerson, Baltimore (Whiteford, Taylor, Preston, Trimble & Johnston, Baltimore, on the brief), for appellee, Cone Mills Corp.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, RODOWSKY and McAULIFFE, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (retired, Specially Assigned).

McAULIFFE, Judge.

This products liability case presents two issues for review. The first involves instructions given on the subject of product misuse in a claim of strict liability in tort. The second involves the admissibility of reports offered as public records, or as material customarily relied upon by experts in the field in forming the basis of an opinion.

On February 25, 1980 Elizabeth Horton Ellsworth was severely burned when the flannelette nightgown she was wearing ignited as a result of its proximity to a front burner of her electric stove. By her original and amended declarations the plaintiff sued the seller of the nightgown, Sherne Lingerie, Inc. (Sherne) and the manufacturer of the textile from which the nightgown was made, Cone Mills Corporation (Cone Mills). The plaintiff advanced three principal theories of liability and sought punitive as well as compensatory damages. First, she alleged that Sherne and Cone Mills were negligent in failing to treat the nightgown so as to make it flame-resistant, and in failing to adequately warn consumers of the dangerous and flammable nature of the garment. Next, she alleged under the theory of strict liability in tort that both defendants had placed a defective and unreasonably dangerous garment into the stream of commerce, and that they had failed to give warnings of the risks or hazards associated with the garment. Finally, she sought recovery from Sherne on the ground that it had breached its implied warranty that the nightgown was fit for ordinary purposes.

At trial, the following facts were established. On the morning of February 25, 1980 plaintiff wore a lady's nightgown into the kitchen to make coffee. She admitted that she was wearing the nightgown inside out and as a result the two pockets at the sides were flapping or protruding. The loosely fitting flannelette nightgown was made of a blend of 87½% cotton and 12½% polyester. The fabric had been manufactured and sold by Cone Mills, and the night-

gown had been designed, manufactured and placed in the stream of commerce by Sherne.

In the kitchen, the plaintiff placed a tea kettle on the left front small burner of the electric range and turned the burner on "high." The kettle only partially covered the burner and approximately $\frac{1}{16}$ to $\frac{1}{2}$ inch of the burner's perimeter was exposed. The plaintiff reached above the stove to obtain a coffee filter from one of the cupboards, and as she was reaching her gown came very close to or in contact with the exposed portion of the burner. The evidence permitted but did not compel a finding that the ignition source was the left pocket. As a result of the burns, the plaintiff suffered severe and permanent injuries.

Cone Mills sold the fabric for the nightgown to Sherne in 1977, and included in the shipping invoice the following warning:

> This fabric is not intended for use in children's sleepwear or robes in sizes 14 and under. Flammable. Does not meet standards for flammability in children's sleepwear, FF5–74 and U.S. Department of Commerce Standard BOCFF3–71. Should not be worn near source of fire.

The language in the invoice was understood by Sherne to be a warning but Sherne made no attempt to convey the warning to consumers. Sherne offered testimony that no other American sleepwear manufacturer passed on any warning to the consumer.

Both defendants conceded it was foreseeable that the nightgown would be worn in a kitchen, and a defense expert conceded the likelihood it would be worn in close proximity to an electric range. Defense experts contended, however, that the fabric was safe for use in adult sleepwear, and that the fabric of the nightgown as well as the finished garment complied with the Federal standard for flammability of

clothing textiles.[1] Plaintiff's expert testified that the flammability characteristics of the nightgown caused it to be defective and unreasonably dangerous, and that the Federal flammability standard was inadequate for the protection of consumers in the light of information available at the time the nightgown was marketed.

At the close of the plaintiff's case the trial judge granted the defendants' motions for directed verdict on the punitive damage counts, and at the conclusion of the case the jury rendered a general verdict in favor of the defendants on the remaining counts. On appeal the Court of Special Appeals affirmed the lower court. *Ellsworth v. Sherne Lingerie, Inc.,* 60 Md.App. 104, 481 A.2d 250 (1984). We granted plaintiff's petition for certiorari to consider the following questions: (1) Whether the trial judge's instructions on misuse of the product and the trial judge's refusal to instruct that contributory negligence is not a defense to strict liability in tort constitute reversible error; and (2) whether annual reports to the President and the Congress required by the Flammable Fabrics Act and prepared by the Secretary of Health, Education and Welfare and the Consumer Product Safety Commission fall within the "public records" exception to the hearsay rule, or are otherwise admissible as reports regularly relied upon by experts in the field.

I

*Misuse of Product*

Appellant claims reversible error because the trial court gave an instruction on misuse of product as a possible defense to the strict liability claim. At trial, Judge Miller gave the following instruction to the jury:

With respect to strict liability, i[n] order for you to find in favor of the plaintiffs, you must find by a preponder-

---

1. Commercial Standard 191-53, issued by the Department of Commerce effective January 30, 1953.

ance of the evidence that the defendants manufactured a defective product which was unreasonably dangerous to the consumer and that the defect was the proximate cause of plaintiff's injuries. And that the defendant has not shown by a preponderance of the evidence that the plaintiff misused the product. So in the strict liability theory, it is for the plaintiff to show by a preponderance of the evidence that the defendants manufactured a defective product, which was unreasonably dangerous and that the defect was a proximate cause of the plaintiff's injuries.

On the other hand, it would be for the defendant, if they established—if the plaintiff established what I just mentioned, it would be the burden of the defendant to show that the defendant misused the product.

\* \* \* \* \* \*

On a strict liability theory, you must find by a preponderance of the evidence that the defendant manufactured a defective product, which was unreasonably dangerous to the consumer and that the defect proximately caused the plaintiff's injuries. That is the burden of the plaintiff.

The burden is then upon the defendant to show that the plaintiff misused that product. So if the plaintiff meets her burden of [showing] the strict liability theory, you then look as to whether the defendant might have shown a misuse of the product.

Appellant argues that the "evidence adduced at trial may be consistent with momentary inattention or carelessness on the part of Appellant, but is inconsistent with affirmative misconduct or use of the nightgown for an abnormal purpose." Both defendants contend there was no error in the jury instruction on misuse. Sherne claims that "the trial court and the Court of Special Appeals found evidence in the record that the manner in which [plaintiff] used her nightgown may not have been a manner foreseeable by the manufacturer and therefore the misuse instruction to the

jury was warranted." Similarly, Cone Mills argues that misuse of the nightgown by the plaintiff became a jury issue based on evidence of the plaintiff's use of the gown "in effect draping it over a hot burner for an appreciable period of time, [which] cannot seriously be considered a reasonably foreseeable manner of use."

This Court, in *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955 (1976) first applied the doctrine of strict liability in tort as expressed in the Restatement (Second) of Torts § 402 A.[2] Under § 402 A, the seller will be liable if the product is in a "defective condition", that is in a condition not contemplated by the ultimate consumer, and "unreasonably dangerous", that is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with ordinary knowledge common to the community as to its characteristics. *Id.* at 344, 363 A.2d 955. In *Phipps*, we noted:

Under § 402 A, various defenses are still available to the seller in an action based on strict liability in tort. These defenses are set forth and explained in the official comments following § 402 A. For example, the seller is not liable where injury results from abnormal handling or use of the product (Comment h), where mishandling or alteration after delivery of the product renders it unsafe (Comment g), or if warnings or instructions supplied with

---

2. Section 402 A provides:
Special Liability of Seller of Product for Physical Harm to User or Consumer
   (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
      (a) the seller is engaged in the business of selling such a product, and
      (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
   (2) The rule stated in Subsection (1) applies although
      (a) the seller has exercised all possible care in the preparation and sale of his product, and
      (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

the product are disregarded by the consumer where, if used in accordance with these warnings, the product would be safe (Comment j). *Id.* at 346, 363 A.2d 955.[3]

Comment h to § 402 A provides a basis for the "misuse" defense. It states:

A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling, as where a bottled beverage is knocked against a radiator to remove the cap; or from abnormal preparation for use, as where too much salt is added to food; or from abnormal consumption, as where a child eats too much candy and is made ill, the seller is not liable.

Most jurisdictions have adopted the Restatement view that misuse or abnormal use is a factor in a strict liability action.[4]

The courts, however, are split on the question of whether the issue of misuse properly arises as a part of a plaintiff's

---

**3.** For a discussion of defenses available in a strict liability action, *See* Digges, *Products Liability in Maryland Revisited,* 7 U.Balt.L.Rev. 1 (1977); L. Frumer & M. Friedman, *Products Liability* §§ 14–15 (1984); Noel, *Defective Products: Abnormal Use, Contributory Negligence, and Assumption of Risk,* 25 Vand.L.Rev. 93 (1972); P. Sherman, *Products Liability for the General Practitioner* §§ 9.01–9.22 (1981); W. Prosser & W. Keeton, *The Law of Torts* § 102 (5th ed. 1984).

**4.** *See, e.g., Meller v. Heil Co.,* 745 F.2d 1297 (10th Cir.1984); *Schwartz v. American Honda Motor Co., Inc.,* 710 F.2d 378 (7th Cir.1983); *Young v. Up-Right Scaffolds, Inc.,* 637 F.2d 810 (D.C.Cir.1980); *Jones v. Menard,* 559 F.2d 1282 (5th Cir.1977); *Kavanaugh v. Kavanaugh,* 131 Ariz. 344, 641 P.2d 258 (1981); *O.S. Stapley Company v. Miller,* 103 Ariz. 556, 447 P.2d 248 (1968); *Kinard v. Coats Co.,* 37 Colo.App. 555, 553 P.2d 835 (1976); *Payne v. Soft Sheen Products, Inc.,* 486 A.2d 712 (D.C.1985); *Williams v. Brown Mfg. Co.,* 45 Ill.2d 418, 261 N.E.2d 305 (1970); *Henkel v. R. and S. Bottling Co.,* 323 N.W.2d 185 (Iowa 1982); *Rey v. Cuccia,* 298 So.2d 840 (La.1974); *Holbrook v. Koehring,* 75 Mich.App. 592, 255 N.W.2d 698 (1977); *Ford Motor Co. v. Matthews,* 291 So.2d 169 (Miss.1974); *Tucci v. Bossert,* 53 A.D.2d 291, 385 N.Y.S.2d 328 (1976); *Olson v. A.W. Chesterton Co.,* 256 N.W.2d 530 (N.D.1977); *Fields v. Volkswagen of America, Inc.,* 555 P.2d 48 (Okl. 1976); *Findlay v. Copeland Lumber Co.,* 265 Or. 300, 509 P.2d 28 (1973); *General Motors Corp. v. Hopkins,* 548 S.W.2d 344 (Tex.1977).

case, or is an affirmative defense. Some courts have referred to misuse as an affirmative defense or part of the defendant's burden of proof. *Davidson v. Stanadyne, Inc.,* 718 F.2d 1334 (5th Cir.1983) (applying the law of Texas); *Beacham v. Lee-Norse,* 714 F.2d 1010 (10th Cir.1983) (applying the law of Utah); *Wood v. Stihl, Inc.,* 705 F.2d 1101 (9th Cir.1983) (applying the law of Washington); *Noel v. S.S. Kresge Co.,* 669 F.2d 1150 (6th Cir.1982) (applying the law of Ohio); *Harville v. Anchor-Wate Co.,* 663 F.2d 598 (5th Cir.1981) (applying the law of Texas); *Hammond v. McDonough Power Equipment, Inc.,* 436 So.2d 842 (Ala. 1983); *Nelson v. Caterpillar Tractor Co.,* 694 P.2d 867 (Colo.Ct.App.1984); *Uptain v. Huntington Lab, Inc.,* 685 P.2d 218 (Colo.Ct.App.1984); *Matthews v. F.M.C. Corp.,* 190 Conn. 700, 462 A.2d 376 (1983); *Gangi v. Sears, Roebuck & Co.,* 33 Conn.Sup. 81, 360 A.2d 907 (1976); *Reeser v. Boats Unlimited, Inc.,* 432 So.2d 1346 (Fla.App.1983); *McBride v. Ford Motor Co.,* 105 Idaho 753, 673 P.2d 55 (1983); *Hancock v. Paccar, Inc.,* 204 Neb. 468, 283 N.W.2d 25 (1979); *Marchese v. Warner Communications, Inc.,* 100 N.M. 313, 670 P.2d 113 (1983); *Messler v. Simmons Gun Specialties, Inc.,* 687 P.2d 121 (Okl.1984); *Kirkland v. General Motors Corp.,* 521 P.2d 1353 (Okl.1974); *Allen v. Heil Co.,* 285 Or. 109, 589 P.2d 1120 (1979); *Norman v. Fisher Marine Inc.,* 672 S.W.2d 414 (Tenn.App.1984); *General Motors Corp. v. Hopkins,* 548 S.W.2d 344 (Tex.1977); *Mulherin v. Ingersoll-Rand Co.,* 628 P.2d 1301 (Utah 1981); *Smith v. Sturm, Ruger & Co., Inc.,* 39 Wash.App. 740, 695 P.2d 600 (1985); *Jackson v. Standard Oil Co. of California,* 8 Wash.App. 83, 505 P.2d 139 (1972).

The recent trend in a number of courts has been to consider the question of misuse as a part of the plaintiff's case, and as being directly related to the issues of defectiveness, or of proximate cause, or both. *Schwartz v. American Honda Co., Inc.,* 710 F.2d 378 (7th Cir.1983) (applying the law of Illinois); *McGowne v. Challenge-Cook Bros., Inc.,* 672 F.2d 652, 661 n. 2 (8th Cir.1982) (applying the law of Missouri); *Amburgery v. Holan Division of Ohio Brass*

*Co.,* 124 Ariz. 531, 606 P.2d 21, 22 (1980); *Illinois State Trust Co. v. Walker Mfg. Co.,* 73 Ill.App.3d 585, 29 Ill.Dec. 513, 392 N.E.2d 70, 73 (1979); *Henkel v. R. and S. Bottling Co.,* 323 N.W.2d 185, 191 (Iowa 1982); *Hughes v. Magic Chef, Inc.,* 288 N.W.2d 542, 546 (Iowa 1980); *Early-Gray, Inc. v. Walters,* 294 So.2d 181, 186 (Miss.1974); *Rogers v. Toro Mfg. Co.,* 522 S.W.2d 632, 637 (Mo.App.1975); *Olson v. A.W. Chesterton Co.,* 256 N.W.2d 530, 535 (N.D.1977). Commentators have agreed. *See* L. Frumer & M. Friedman, *Products Liability* § 15.01 (1984); J. Dooley, *Modern Tort Law* § 32.79 (1983 & Cum.Supp.1984); Noel, *Defective Products: Abnormal Use, Contributory Negligence, and Assumption of Risk,* 25 Vand.L.Rev. 93, 96 (1972).

Other courts have referred to the "defense" of misuse without specifying whether it is an affirmative defense, or evidence that tends to negate the plaintiff's case. *See for example Young v. Up-Right Scaffolds, Inc.,* 637 F.2d 810 (D.C.Cir.1980).

The problem of understanding the issue of misuse in strict liability cases is further compounded by the absence of agreement as to the meaning of the word. Misuse has been defined as: a use not reasonably foreseeable, *Payne v. Soft Sheen Products, Inc.,* 486 A.2d 712, 725 (D.C.1985); *Ford Motor Company v. Matthews,* 291 So.2d 169, 174 (Miss.1974); a use of the product in a manner which defendant could not reasonably foresee, *McGowne v. Challenge-Cook Bros., Inc.,* 672 F.2d 652, 661 (8th Cir.1982); *Hughes v. Magic Chef, Inc.,* 288 N.W.2d 542, 545 (Iowa 1980); a use of a product where it is handled in a way which the manufacturer could not have reasonably foreseen or expected in the normal and intended use of the product and the plaintiff could foresee an injury as the result of the unintended use, *Harville v. Anchor-Wate Co.,* 663 F.2d 598, 602–03 (1981) (applying the law of Texas); *General Motors Corp. v. Hopkins,* 548 S.W.2d 344, 348–52 (Tex.1977); a use or handling so unusual that the average consumer could not reasonably expect the product to be designed and manufactured to withstand it—a use which the seller, therefore,

need not anticipate and provide for, *Findlay v. Copeland Lumber Co.*, 265 Or. 300, 509 P.2d 28, 31 (1973); use of the product which constitutes wilful or reckless misconduct or an invitation of injury, *Gangi v. Sears, Roebuck & Co.*, 33 Conn.Sup. 81, 360 A.2d 907, 909 (1976). The Fifth Circuit, in *Jones v. Menard*, 559 F.2d 1282, 1285 n. 4 (5th Cir.1977) (applying the law of Louisiana), defined misuse in the context of the three types of products cases. That court said,

> [i]n inadequate warning cases misuse means that the seller had no duty to warn against unforeseeable uses of its products, while in design cases misuse means that the manufacturer had no duty to design a product so as to prevent injuries arising from unforeseeable uses of that product.... In defective manufacture cases, however, misuse means that the injury was not caused by some inherent defect in the product but by the consumer's abnormal use of it....[5]

It has been suggested that misuse means any use not intended by the manufacturer, but this is too narrow and fails to take into account a variety of uses reasonably foreseeable although not subjectively intended. It has also been suggested that virtually anything is possible, and thus arguably foreseeable, so that foreseeability as a test is too broad.

■  We conclude, as have most courts which have considered the issue, that "reasonable foreseeability" is the

---

**5.** *See also,* W. Prosser & W. Keeton, *The Law of Torts* § 102 (5th ed. 1984) (misuse is defined as a use different in a kind from what was intended, and unforeseeable misuse in the sense of a use that could not reasonably have been anticipated by the manufacturer); J. Dooley, *Modern Tort Law* § 32.79 (1983 & Cum.Supp.1984) (misuse is using it for a purpose neither intended nor foreseeable by the defendant); L. Frumer & M. Friedman, *Products Liability* § 15.01 (1984) (misuse is the abnormal or unintended use of the product if such use was not reasonably foreseeable); P. Sherman, *Products Liability for the General Practitioner* § 9.06 (1981) (misuse is an unintended and unforeseeable use of a product, by a user, consumer, or third party, that is not in accord with the purpose for which the product was intended).

appropriate test, and thus a seller is required to provide a product that is not unreasonably dangerous when used for a purpose and in a manner that is reasonably foreseeable.[6] If a product is unreasonably dangerous for such use it is "defective" within the meaning of § 402 A of the Restatement, and if that defect is a cause of damage the seller will be responsible. On the other hand, if the product is not unreasonably dangerous when used for a purpose and in a manner that is reasonably foreseeable, it simply is not defective, and the seller will not be liable.[7]

■ Misuse of a product may also bar recovery where the misuse is the sole proximate cause of damage, or where it is the intervening or superseding cause.[8] For example, a high speed electric drill may be defective because a manufacturing defect causes it to short circuit and produce a shock during normal usage. A plaintiff who attaches a brush to that drill and in attempting to clean his teeth suffers injury to his mouth from the high speed of the brush will lose because his misuse is the sole cause of his misfortune, and the defect in the drill is not in any way related to the harm.[9]

---

6. *See Moran v. Faberge,* 273 Md. 538, 545–46, 332 A.2d 11 (1975), discussing reasonable foreseeability in the context of a negligence action.

7. Whether foreseeability of use relates to the requirement of proof of "defective condition" or to proof of being "unreasonably dangerous" the result is the same, for both must be proven as a part of a plaintiff's case. Comments g and h of § 402 A support the prevailing view that misuse relates to the existence *vel non* of a defect.

8. *See Ford Motor Co. v. Matthews, supra,* 291 So.2d at 175–76; *Doran v. Pullman Standard Car Mfg. Co.,* 45 Ill.App.3d 981, 4 Ill.Dec. 504, 360 N.E.2d 440, 445 (1977); W. Prosser & W. Keeton, *The Law of Torts* § 102 (5th ed. 1984). *See also Jones v. Baltimore Transit Co.,* 211 Md. 423, 127 A.2d 649 (1957), describing an intervening cause as not a concurrent and contributing cause but a superseding cause which itself is the natural and logical cause of the harm.

9. For a discussion of a similar hypothetical situation *see* Vargo, *The Defenses to Strict Liability in Tort: A New Vocabulary With An Old Meaning,* 29 Mercer L.Rev. 447, 459 (1978).

■ Misuse may also embrace the concept of mishandling. As Comment g of § 402 A states "the seller is not liable when he delivers the product in a safe condition, and subsequent mishandling ... make[s] it harmful by the time it is consumed." The burden of proof is upon the plaintiff to show that the product was in a defective condition when it left the hands of the seller.

■ From what we have said it is apparent that questions of misuse of the product are involved in the determination of whether the product was defective, and whether a defect was the proximate cause of the injury. Because defectiveness and causation are elements which must be proved by the plaintiff, we conclude that misuse is not an affirmative defense. Misuse, therefore, is a "defense" only in the sense that proof of misuse negates one or more essential elements of a plaintiff's case, and may thereby defeat recovery.

■ In contrast, "assumption of risk" is an affirmative defense, and where properly raised by the pleadings,[10] may be an issue in a strict liability case. As the Court of Special Appeals stated in *Sheehan v. Anthony Pools,* 50 Md.App. 614, 626 n. 11, 440 A.2d 1085 (1982), *aff'd,* 295 Md. 285, 455 A.2d 434 (1983) (Part III adopted in full), "The three subjective elements that the defendant must show are: 1) the plaintiff actually knew and appreciated the particular risk or danger created by the defect; 2) the plaintiff voluntarily encountered the risk while realizing the danger; and 3) the plaintiff's decision to encounter the known risk was unreasonable." [11] To conclude our general discussion of "defenses" we repeat our earlier holding that contributory negligence is not a defense in an action of strict liability in tort. *Anthony Pools v. Sheehan, supra,* 295 Md. at 299, 455

---

**10.** *See* Rule 2–323(g) requiring that specified affirmative defenses be specially pleaded.

**11.** The subjective standard involved in this defense is directly opposite to the objective standard found in contributory negligence. *Sheehan v. Anthony Pools, supra,* 50 Md.App. at 625 n. 10, 440 A.2d 1085.

A.2d 434.   Conduct which operates to defeat recovery may in fact be negligent, but confusion will be avoided if it is remembered that a plaintiff is barred only because such conduct constitutes misuse or assumption of risk, and not because it constitutes contributory negligence.[12]

■■   Applying these principles to the facts of this case, we conclude the evidence was insufficient to generate an issue of misuse, and that the trial judge erred in allowing the jury to consider misuse of the product as a possible bar to recovery.   Clearly, and concededly, Appellant was using the nightgown for a reasonably foreseeable purpose.   We conclude that her manner of use of the nightgown, though possibly careless, was reasonably foreseeable as a matter of law.   It certainly may be foreseen that wearing apparel, such as nightgowns and robes, will occasionally be worn inside out.   It is also foreseeable that a loosely fitting gown will come into contact with sources of ignition in the environment where it may be expected to be worn, and particularly when worn in the kitchen and near a stove.   Momentary inattention or carelessness on the part of the user, while it may constitute contributory negligence, does not add up to misuse of the product under these circumstances.

■■■   Plaintiff also alleges error because the trial court refused to instruct the jury that contributory negligence is not a defense to a strict liability action.   A plaintiff in a

---

12.   Failure to read or follow instructions or warnings also involves conduct that may be considered negligent.   Again, however, contributory negligence is not involved, and the conduct is instead relevant to consideration of defectiveness of the product, or assumption of risk by the plaintiff, or both.   If a product otherwise unreasonably dangerous can be made safe for reasonably foreseeable uses by adequate warnings or instructions, liability will be avoided, and the focus in such cases is generally upon the adequacy of the notice.   If the warnings or instructions are adequate the product is not defective, and the plaintiff cannot recover under a theory of strict liability in tort.   The cause of the injury in such cases is the failure to read or follow the adequate warnings or instructions, and not a defective product.   One who reads the warning and then proceeds voluntarily and unreasonably to encounter the danger thereby made known to him will assume the risk of that danger.

products liability case may plead alternative causes of action, and if the plaintiff alleges negligence in addition to strict liability, a defendant may be entitled to instructions on contributory negligence, assumption of risk, and misuse. A jury could easily misapply a contributory negligence defense to a strict liability action [13] and care must be taken to explain the law applicable to each cause of action.

In *Sheehan v. Anthony Pools, supra,* 50 Md.App. at 623, 440 A.2d 1085, the Court of Special Appeals noted that jury instructions were silent as to the manner in which an injured plaintiff had used a diving board. The court said that "there is substance to the [plaintiff's] claim that the jury was left without guidance on a point of critical importance, *i.e.,* the type of conduct on the part of the consumer in the use of the product which could or could not afford a valid defense to the seller...." *Id.* The court concluded "an instruction should have been granted that [the plaintiff's] inadvertent or careless use of the [product] would not bar his recovery." *Id.* at 626, 440 A.2d 1085.

When theories of negligence and strict liability in tort are being presented to a jury, and the defense of contributory negligence is properly before the jury, a trial judge may well find it helpful to specifically instruct the jury that contributory negligence is not a defense to the strict liability action. In some cases, however, where the same conduct may conceivably constitute both contributory negligence and misuse of a product, a negative instruction may not be the best approach, and the trial judge may find that a careful explanation of each cause of action and any defenses applicable thereto is preferable. We therefore decline to adopt a *per se* rule relating to the granting of a negative instruction where both causes of action are

---

**13.** In *Young v. Up-Right Scaffolds, Inc.,* 637 F.2d 810 (D.C.Cir.1980), the trial court's failure to instruct the jury that contributory negligence was not a defense to a strict liability claim warranted reversal.

present,[14] preferring instead the flexible approach of Md. Rule 2–520(c):

> The court may instruct the jury, orally or in writing or both, by granting requested instructions, by giving instructions of its own, or by combining any of these methods. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

## II

### *Evidentiary Rulings*

We turn to a consideration of evidentiary questions that are likely to recur upon retrial. These questions involve five separate reports required by the Flammable Fabrics Act to be made to the President and the Congress by government officials.[15] We shall treat separately three issues bearing on the admissibility of these reports or parts thereof: relevance, admissibility to demonstrate the basis of an expert's opinion, and admissibility pursuant to a public records exception to the hearsay rule.

---

**14.** In view of the danger that a jury, even with the best of instructions, may confuse the concepts of misuse and contributory negligence, counsel for ·plaintiffs may wish to carefully balance the perceived benefits of including a negligence count against the risk of confusion which may thereby result.

**15.** The Flammable Fabrics Act, 15 U.S.C. §§ 1191–1204, was enacted by Congress in 1953. Section 1201 of the Act required the Secretary of Health, Education and Welfare in cooperation with the Secretary of Commerce to "conduct a continuing study and investigation of the deaths, injuries and economic losses resulting from accidental burning of products, fabrics, or related materials" and to annually report the results to the President and the Congress. This responsibility was transferred to the Consumer Product Safety Commission in 1972 by § 2079 of the Consumer Product Safety Act, 15 U.S.C. §§ 2051–83. The first report offered by appellant covered the period of February, 1969 to June, 1970, and subsequent reports were for fiscal years of 1972, 1974, 1975, 1979 and 1980. The first two reports were prepared by the Secretary of Health, Education and Welfare, and the balance were prepared by the Consumer Product Safety Commission.

## A

### *Relevance*

■ Relevance has been defined in *McCormick on Evidence* § 185, at 541 (E. Cleary 3d ed. 1984) as follows:

There are two components to relevant evidence: materiality and probative value. Materiality looks to the relation between the propositions for which the evidence is offered and the issues in the case. If the evidence is offered to help prove a proposition which is not a matter in issue, the evidence is immaterial. What is "in issue," that is, within the range of the litigated controversy, is determined mainly by the pleadings, read in the light of the rules of pleading and controlled by the substantive law.

     \*     \*     \*     \*     \*     \*

The second aspect of relevance is probative value, the tendency of evidence to establish the proposition that it is offered to prove.

Under any theory advanced by appellant she was obliged to show that the nightgown was unreasonably dangerous to a prospective user when it was sold. Proof that the product was unreasonably dangerous is clearly required in an action based upon strict liability in tort, and it is no less important when the plaintiff is attempting to prove negligence in the design or sale of the product, or attempting to prove the negligent failure to include an adequate warning or instruction. Her burden was made more difficult by the fact that the material of this nightgown met and exceeded the requirements of the Federal standard for flammability of clothing textiles.[16] Appellant sought to introduce evidence of the incidence and severity of burns caused by ignition of clothing that was subject to the Federal standard in order to overcome the inference that clothing which complied with that standard was not unreasonably dangerous.

---

**16.** Commercial Standard 191–53, issued by the Department of Commerce effective January 30, 1953.

Compliance with a statutory standard is evidence of due care, but compliance with the standard does not preclude a finding of negligence for failure to take additional precautions. *See* W. Prosser & W. Keeton, *The Law of Torts* § 36 (5th ed. 1984). Similarly, in a strict liability case proof that a product complied with a statutory standard does not preclude a finding of defectiveness. *See* J. Dooley, *Modern Tort Law* § 32.54 (1983 & 1984 Cum.Supp.). *See also Gryc v. Dayton-Hudson Corp.*, 297 N.W.2d 727 (Minn. 1980), *cert. denied*, 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980) (affirming an award for punitive damages despite evidence of compliance with the Flammable Fabrics Act).[17]

The reports are material to the issues and tend to establish the proposition that the nightgown as sold was unreasonably dangerous to prospective users, and therefore the reports should not have been excluded on grounds of relevance.

B

*Basis of Expert's Opinion*

In addition to offering the reports as substantive evidence (see Part II C, *infra* ) appellant also offered testimony concerning the contents of the reports to explain the basis of her expert's opinion. Dr. Stephen Spivak, a professor in the Department of Textile and Consumer Economics at the University of Maryland, testified that the nightgown was defective and unreasonably dangerous due to its flammability characteristics, and that the 1953 Federal standard was inadequate for the protection of consumers. In attempting to explain the basis of his opinions, Dr. Spivak sought to utilize data taken from the reports. He testified concerning the statutory mandate for the preparation of the

---

**17.** In this case a child four years of age suffered serious burns when her cotton flannelette pajamas ignited as she reached across an electric stove to shut off a timer. She was awarded $750,000.00 compensatory damages and $1,000,000.00 punitive damages.

reports and that the data contained within the reports was recognized as reliable and was in fact relied upon by him and by other experts in the field. The trial judge ruled that testimony concerning the data contained in the reports was inadmissible as hearsay.

The proffered evidence was indeed hearsay, but was admissible for the limited purpose of explaining the basis for the expert's opinion. In *Attorney Grievance Comm'n v. Nothstein,* 300 Md. 667, 679, 480 A.2d 807 (1984), Judge Smith carefully reviewed the history and development of this rule of evidence, and quoted as follows from D. Binder, *Hearsay Handbook* § 1.01, at 451 (2d ed. 1983):

> The federal courts and a majority of state courts permit an expert witness to express an opinion that is based, in part, on hearsay of a kind that is customarily relied on by experts in that particular business, profession, or occupation. However, the hearsay itself is not admissible as substantive evidence. It is only admissible to explain the basis of the expert's opinion. In other words, the trier of fact is allowed to give credence to an expert's opinion that is based on the assumption that certain hearsay is true, but is not allowed to give credence to the hearsay itself.

This rule has long been accepted in Maryland. *Consol. Mech. Contractors v. Ball,* 263 Md. 328, 283 A.2d 154 (1971); *Airlift, Ltd. v. Bd. of Co. Comm'rs,* 262 Md. 368, 278 A.2d 244 (1971); *Baltimore & O.R.R. v. Hammond,* 128 Md. 237, 97 A. 532 (1916); *Baltimore City v. Hurlock,* 113 Md. 674, 78 A. 558 (1910).

Appellant was entitled to elicit from her expert the reasons for his opinion, and having laid a proper foundation for the introduction of statistical information contained in the reports, the evidence should have been admitted.

## C

### *Public Records Exception*

Appellant also offered the reports as substantive evidence, suggesting their admissibility pursuant to a public

records exception to the hearsay rule.[18]   The reports were properly authenticated, and the only objections interposed were on grounds of relevance and hearsay.   In rejecting the reports, Judge Miller said:

> I am not going to admit either one of them.   I think to admit a document, first of all a hearsay document—it may be a document of the United States government, but you cannot try cases on the basis of documents containing hearsay information. . . .

The reports are clearly hearsay in character, and contain not only primary hearsay, but secondary and tertiary hearsay as well.   Appellant does not dispute this but contends that reports required by law to be prepared by a government official and submitted annually to the President and the Congress enjoy a presumption of reliability that is not rebutted by any evidence in this case, and that the reports should therefore have been admitted.

*McCormick on Evidence* § 315, at 888 (E. Cleary 3d ed. 1984) describes the common law exception for public records:   "The common law evolved an exception to the hearsay rule for written records and reports of public officials under a duty to make them, made upon firsthand knowledge of the facts.   These statements are admissible as evidence of the facts recited in them."

The modern trend has been to admit public records when the information is gathered by a public officer under a statutory duty to investigate and record or certify facts ascertained by other than personal observation.   5 J. Wigmore, *Evidence* § 1635, at 531 (3d ed. 1940) states:

> Now there may be cases in which the officer's duty clearly does involve his ascertainment of facts occurring out of his presence and requiring his resort to sources of

---

**18.**   Appellant correctly eschews reliance on Maryland Code (1974, 1984 Repl.Vol.) § 10–204 of the Courts and Judicial Proceedings Article as authority for introduction of the reports.   Section 10–204 applies only to agencies of a state or of a political subdivision, and authorizes receipt of true copies of records only if they are otherwise admissible.

information other than his own senses of observation; for example, an assessor's record of the value of real estate and its occupancy, or a registrar of voters' record of electors' residences. When such a duty clearly exists, the general doctrine above, that a witness should have personal knowledge, need not stand in the way, for (as already noted) it has its conceded limitations; and where the officer is vested with a duty to ascertain for himself by proper investigation, this duty should be sufficient to override the general principle. It is true that due caution should be observed before reaching the conclusion that the law has in fact in a given case intended to invest the officer with such an unusual duty. But when it clearly appears that a duty has been prescribed to investigate and to record or certify facts ascertained other than by personal observation, then it follows that, in accordance with the general principle of the present exception, the statement thus made becomes admissible.

In reaching the same result, *McCormick on Evidence* § 317, at 737–38 (E. Cleary 2d ed. 1972) reasoned:

To some extent, the conclusions of a professional investigator making inquiries required by his professional and public duty contain assurances of reliability analogous to those relied upon as assuring accuracy of his statements of fact from firsthand knowledge. A skilled investigator can be presumed to report as accurate or to rely upon a hearsay statement only after inquiry into its accuracy. Often such an inquiry, by one professionally equipped to make it well and on the scene at a time when events are fresh and inquiry is most likely to be fruitful, could be relied upon to assure the reliability of those hearsay statements upon which he relies. Much the same could be said of his conclusions. In both cases, it is clear that the report and its conclusions are recognized by all concerned to lay the foundation for future official action, which is likely to stimulate the same habitual accuracy in reporting facts known that underlies the exception for official records generally. (Footnotes omitted).

Fed.R.Evid. 803(8) provides that the following are not excluded by the hearsay rule, even though the declarant is available as a witness:

> Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.[19]

As stated in the advisory committee notes following the rule, "[j]ustification for the exception is the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record."

The discussion of the Fourth Circuit Court of Appeals in *Ellis v. International Playtex, Inc.*, 745 F.2d 292, 300 (4th

---

**19.** *Compare* revised Unif.R.Evid. 803(8) (1974):

To the extent not otherwise provided in this paragraph, records, reports, statements, or data compilations in any form of a public office or agency setting forth its regularly conducted and regularly recorded activities, or matters observed pursuant to duty imposed by law and as to which there was a duty to report, or factual findings resulting from and investigation made pursuant to authority granted by law. The following are not within this exception to the hearsay rule: (i) investigative reports by police and other law enforcement personnel; (ii) investigative reports prepared by or for a government, a public office, or an agency when offered by it in a case in which it is a party; (iii) factual findings offered by the government in criminal cases; (iv) factual findings resulting from special investigation of a particular complaint, case, or incident; and (v) any matter as to which the sources of information or other circumstances indicate lack of trustworthiness.

Cir.1984), is helpful in understanding the reasons which underlie the rule:

"Admissibility in the first instance" is assumed because of the reliability of the public agencies usually conducting the investigation, and "their lack of any motive for conducting the studies other than to inform the public fairly and adequately." *Kehm v. Proctor & Gamble,* 724 F.2d 613, at 618, 619 (8th Cir.1983). This is not to say that a report containing the findings of a public agency, made pursuant to an investigation authorized by law, is always admissible. To the contrary, if "sufficient negative factors are present" to indicate the report is not trustworthy, it should not be admitted. Fed.R.Evid. 803(8)(C), advisory committee note. The factors that may be used to determine admissibility include: (1) the timeliness of the investigation; (2) the special skill or experience of the official; and (3) possible motivation problems. *Id.* But the burden is on the party opposing admission to demonstrate that the report is not reliable. *See Kehm,* at 618; *Baker v. Elcona Homes Corp.,* 588 F.2d 551, 558 (6th Cir.1978), *cert. denied,* 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979).

Placing the burden on the opposing party makes considerable practical sense. Most government sponsored investigations employ well accepted methodological means of gathering and analyzing data. It is unfair to put the party seeking admission to the test of "re-inventing the wheel" each time a report is offered. Rather than requiring the moving party to spend considerable time and money to ensure that the experts who conducted the study are available at trial, it is far more equitable to place that burden on the party seeking to demonstrate why a time tested and carefully considered presumption is not appropriate.

The interpretations given Fed.R.Evid. 803(8)(C) by the federal courts have not been entirely harmonious. Initially, some courts expressed concern over the admission of reports where the government official did not appear to have

firsthand knowledge of the facts. There is now general recognition, however, that the hearsay nature of the evidence is a factor to be considered in determining the presence or absence of trustworthiness, but the presence of any level of hearsay does not, by that fact itself, render the report untrustworthy. *McCormick on Evidence* § 316, at 890 (E. Cleary 3d ed. 1984) states:

> Investigative reports ... as the name indicates embody the results of some kind of investigation and accordingly almost by definition are not the product of firsthand knowledge on the part of the declarant, which is characteristic of most hearsay exceptions. Also, investigations vary with respect to the timeliness and nature of the inquiry, the procedures followed, possible motivational factors, and the skill of the official or agency. It is not surprising that considerable differences of views developed among courts regarding the wisdom of admitting investigative reports as an exception to the rule against hearsay. The trend, however, has been to recognize that much useful evidence is to be found in investigative reports, with impetus from the many statutory enactments providing for admissibility. (Footnotes omitted).

The more difficult problem, and the one that has produced a significant disagreement among the courts, involves the admissibility of opinions, conclusions and determinations of the investigating officer or agency. The rule speaks to the admissibility of "factual findings" resulting from an investigation, but increasing numbers of federal appellate courts are allowing trial judges broad discretion to accept opinions and judgments found in "evaluative reports". Reference to the legislative history is not helpful in resolving this conflict.

> The meaning of the term "factual findings" is left unclear by the legislative history. The Advisory Committee's Note, after referring to the federal statutes conferring admissibility upon various kinds of investigative reports, concluded "the willingness of Congress to recognize a substantial measure of admissibility for evaluative re-

ports is a helpful guide." The Report of the House Committee on the Judiciary took an opposing stand: "The Committee intends that the phrase 'factual findings' be strictly construed and that evaluations or opinions contained in public reports shall not be admissible under this Rule." House Comm. on Judiciary, Fed.Rules of Evidence, H.R.Rep. No. 650, 93d Cong., 1st Sess., p. 14 (1973). The Report of the Senate Committee on the Judiciary rejected this view: "The committee takes strong exception to this limited understanding of the application of the rule.... The committee concludes that the language of the rule together with the explanation provided by the Advisory Committee furnish sufficient guidance on the admissibility of evaluative reports." Senate Comm. on Judiciary, Fed.Rules of Evidence, S.Rep. No. 1277, 93d Cong., 2d Sess., p. 18 (1974). *McCormick on Evidence* § 316, at 890–91 n. 7 (E. Cleary 3d ed. 1984).

The line between "fact" and "opinion" is often difficult to draw. An investigating body may hear diametrically opposed testimony on the question of whether one person or another struck the first blow, and proceed to decide the issue as a finding of "fact". That determination necessarily has a judgmental quality, and differs, for example, from a finding of fact that a certain number of persons suffered burns from ignition of clothing fabric during a given period. Conclusions found in reports need not be judgmental. A conclusion that there has been a significant increase in fabric-related burn injuries is essentially factual if the datum shows a 60% increase. Thus, attaching labels of "fact" or "opinion" or "conclusion" will not necessarily resolve the issue, and careful attention must be given to the true nature of the statement and the totality of circumstances bearing on the ultimate issue of reliability. Third level

hearsay may possess significant indicia of reliability in one case and be clearly unreliable in another.[20]

In *Ellis* and in *Kehm* reports of epidemiological studies conducted by the Center for Disease Control and reporting the incidence of menstruation and tampon use among those persons suffering toxic shock syndrome were found admissible, each court noting that complaints about the methodology of data collection were insufficient to overcome the presumption of reliability.

In *Robbins v. Whelan*, 653 F.2d 47 (1st Cir.), *cert. denied*, 454 U.S. 1123, 102 S.Ct. 972, 71 L.Ed.2d 110 (1981) a Department of Transportation National Highway Safety Bureau report providing information on maximum stopping distances for all automobiles manufactured in a certain year was held admissible, even though the data was supplied by individual automobile manufacturers. The court noted that data collection was required by regulations issued by the National Highway Safety Bureau, and although the required tests were not monitored by federal officials the circumstances under which the information was collected and reported were indicative of reliability.

The greater number of federal courts considering Rule 803(8)(C) have adopted the more liberal view of the Senate Committee on the Judiciary, and have admitted evaluative reports unless sufficient negative factors were present to demonstrate unreliability. *See, e.g., Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976) (prior administrative findings made with respect to employ-

---

**20.** Since 1972, data accumulation for preparation of the reports offered by appellant has included information transmitted by the National Electronic Injury Surveillance System (NEISS), operated by the Consumer Product Safety Commission's Bureau of Epidemiology. NEISS is a computer-based network of 119 statistically selected hospital emergency rooms located throughout the country. Thus, a patient will relate facts to a nurse or doctor, who may in turn inform a computer operator, who will then transmit the facts to the Commission, which will in turn report to the President and Congress. Notwithstanding the levels of hearsay involved, the circumstances of that type of information gathering may well satisfy the requirement of reliability.

ment discrimination claim admitted in federal-section trial *de novo* ); *Ellis v. International Playtex, Inc., supra* (analysis of statistics relating to tampon use and incidence of toxic shock syndrome admitted); *Wilson v. Beebe,* 743 F.2d 342 (6th Cir.1984) (memorandum of police captain finding subordinate officer had acted contrary to department training in weapons use and handling admitted in negligence action against police officer); *Litton Systems, Inc. v. American Tel. & Tel. Co.,* 700 F.2d 785 (2d Cir.1983) (Federal Communications Commission decision finding telephone company tariffs to be unreasonable, discriminatory, and unnecessarily restrictive admitted in anti-trust action); *Falcon v. General Tel. Co. of Southwest,* 626 F.2d 369 (5th Cir.1980), *vacated on other grounds,* 450 U.S. 1036, 101 S.Ct. 1752, 68 L.Ed.2d 234 (1981) (findings of Government Services Administration contained in letter to employer admitted in employment discrimination action); *Garcia v. Gloor,* 618 F.2d 264 (5th Cir.1980) (findings of Equal Employment Opportunities Commission and Texas Employment Commissioner's Appeal Tribunal admitted in employment discrimination action); *Lloyd v. American Export Lines, Inc.,* 580 F.2d 1179 (3d Cir.), *cert. denied sub nom, Alvarez v. American Export Lines, Inc.,* 439 U.S. 969, 99 S.Ct. 461, 58 L.Ed.2d 428 (1978) (decision of Coast Guard hearing examiner that claims of assault and battery and of intoxication were not proven admitted in unseaworthiness claim); *Baker v. Elcona Homes Corp.,* 588 F.2d 551 (6th Cir.1978), *cert. denied,* 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979) (police accident report containing opinion of officer as to which vehicle entered intersection on red light admitted in civil action).

While most courts have determined that evaluative reports are to be admitted or excluded in the exercise of the sound discretion of the trial court, the Ninth Circuit has determined that administrative findings are admissible *per se* in employment discrimination claims whether brought under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*) or under 42 U.S.C. § 1981. *See Plummer*

*v. Western Intern. Hotels Co., Inc.,* 656 F.2d 502 (9th Cir.1981).

■■■ We agree that the Public Records exception to the hearsay rule appropriately allows the reception of reliable facts, and will be recognized in this state in the form in which it appears at Fed.R.Evid. 803(8). We make clear, however, that the term "factual findings" will be strictly construed and that evaluations or opinions contained in public reports will not be received unless otherwise admissible under this State's law of evidence.[21]

The Public Records exception as here adopted will permit the reception of reliable facts otherwise difficult to bring before the trier of fact, but avoid the influence of opinions that ordinarily ought to be received only after full opportunity for examination of the witness' credentials and full opportunity for cross examination concerning the basis of any opinion expressed.

■■■ We also make clear that even though the burden rests upon the party opposing the introduction of a public record to demonstrate the existence of negative factors sufficient to overcome the presumption of reliability, this does not mean that additional evidence will be required in every case to meet that burden. Indicia of unreliability may be contained in the report itself, or may be disclosed by the evidence of the party offering the report.

■■■ Additionally, we point out that the inclusion within a factual report of inadmissible evaluations or opinions need not necessarily result in exclusion of the entire report, and the trial judge should consider redaction of the report in that event.

---

**21.** *See, e.g., Holloway v. Eich,* 255 Md. 591, 258 A.2d 585 (1969); *Smith v. Jones,* 236 Md. 305, 203 A.2d 865 (1964); *Dunn v. State,* 226 Md. 463, 174 A.2d 185 (1961). *See also Marlow v. Cerino,* 19 Md.App. 619, 313 A.2d 505 (1974).

We do not rule on the admissibility of these reports because that determination should be made in the first instance by the trial judge if they are offered on retrial.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND FOR A NEW TRIAL; COSTS TO BE PAID BY APPELLEES.

ELDRIDGE, Judge, concurring:

I agree with the result reached by the majority, and I join in Part I of the opinion. I also agree with the majority's adoption in Part II of the "Public Records" exception to the hearsay rule. Nevertheless, I would not "strictly construe" or limit the exception to "factual findings." To deny the trial court any discretion in admitting evaluations or opinions contained in public records is both contrary to the weight of the case law and unsound.

One formulation of the public records exception is set forth in Fed.R.Evid. 803(8)(C), which provides that public documents containing *"factual findings* resulting from an investigation made pursuant to authority granted by law" are not to be excluded by the hearsay rule. (Emphasis added.) As we are adopting the public records exception as a common law development, and since we are not construing a rule or statute, we are not of course limited by the wording of the federal rule. Nonetheless, even the cases under the federal rule have not strictly construed or applied the phrase "factual findings."

The majority cites several federal cases which have addressed the construction to be given the "factual findings" language of Rule 803(8)(C). The majority quotes *Ellis v. International Playtex, Inc.,* 745 F.2d 292 (4th Cir.1984), regarding the rule's underlying rationale. The court in *Ellis* further noted (745 F.2d at 301):

[303 Md. 581 (1985).]

"Although there has been some disagreement over whether 'evaluative' public records or reports were intended by Congress to be considered 'factual findings' for the purposes of Fed.R.Evid. 803(8)(C), *it is well established that the phrase should be interpreted broadly.*" (Emphasis added.)

One of the cases relied upon in *Ellis* was *Kehm v. Proctor & Gamble Mfg. Co.,* 724 F.2d 613 (8th Cir.1983), in which it was stated (724 F.2d at 618):

"[C]ourts construing the term 'factual findings' in Rule 803(8)(C) have given it broad scope. *See, e.g., United States v. American Telephone & Telegraph Company,* 498 F.Supp. 353, 360 (D.D.C.1980) (citing cases). They have ·often admitted government reports setting forth agency opinions and conclusions on the ground that such reports, because they are public records based on investigations conducted pursuant to lawful authority, are presumptively reliable. That is, 'there is no reason not to admit the findings simply because they tend towards the conclusory rather than the factual end, unless, as Rule 803(8)(C) further provides, the 'sources of information or other circumstances indicate lack of trustworthiness.' *Id. See also Baker v. Elcona Homes Corp.,* [588 F.2d 551 (6th Cir.1978), *cert. denied,* 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979) ]; *United States v. School District of Ferndale, Michigan,* 577 F.2d 1339, 1354 (6th Cir.1978). We agree with the district court that once a report is conclusively shown to represent findings of a public agency made pursuant to an investigation authorized by law, the central inquiry becomes whether the report is trustworthy."

The overwhelming majority of cases are in accord with this view. *Litton Systems v. American Telephone & Telegraph Co.,* 700 F.2d 785 (2d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984); *Melville v. American Home Assur. Co.,* 584 F.2d 1306 (3d Cir.1978); *Wetherill v. University of Chicago,* 518 F.Supp. 1387 (N.D. Ill.1981); *Zenith Radio Corp. v. Matsushita Electrical*

*Industrial Co., Ltd.,* 505 F.Supp. 1125 (E.D.Pa.1980); *see* 4 *Weinstein's Evidence,* ¶ 803(8)[03].

As I understand the majority, the Court is drawing a firm line between "fact" and "opinion," and is requiring the trial judge to distinguish, in every instance in which a public record is offered for admission, between fact and opinion. The majority is not allowing the trial judge any latitude or discretion in admitting evaluations or conclusions if, as a matter of law, they are deemed to fall within the category of "opinions." This is an unworkable rule.

The principal problem with this approach, as the majority seems to acknowledge, is that there is often no clear line between "fact" and "opinion." This Court, regarding the gray area between the two, stated in *Glaros v. State,* 223 Md. 272, 277, 164 A.2d 461 (1960): "The assumption that there is a difference in kind between 'fact' and 'opinion' has been said to be an illusion. 'There is no conceivable statement however specific, detailed, and "factual," that is not in some measure the product of inference and reflection as well as observation and memory.' "

By not allowing the trial judge any discretion, the Court forces him to go painstakingly through any public record or report and attempt to exclude all material that may not be in the strictest sense "factual." This could present a very difficult and time consuming task, and one in which there are no satisfactory guidelines. Moreover, the majority's position will present a problem not only to the trial courts, but to the appellate courts as well. In every case where the public records exception is involved, an appeal may be predicated on the ground that certain "opinions" were erroneously admitted or that relevant "facts" were excluded.

In my view, the trial judges should be given some degree of discretion in admitting the contents of public records. If a public agency or official is deemed to supply sufficiently accurate and trustworthy reports for the factual findings to be admitted into evidence, it should logically follow that the agency's or official's conclusions would also be sufficiently

reliable. To decide otherwise, by denying the trial court any discretion when admitting public records, is unreasonable.

Accordingly, I would follow the majority of cases in allowing the trial court a degree of discretion with regard to the admissibility of the contents of public records. Therefore, I cannot join all of Part II of the Court's opinion.