**Benjamin F. CADES, individually, and on behalf of all persons similarly situated, Plaintiff–Appellant,**

v.

**H & R BLOCK, INCORPORATED; Beneficial National Bank, Defendants–Appellees.**

**State of West Virginia; State of Michigan; State of Kentucky; State of Connecticut; Iowa Division of Banking; Arkansas State Bank Department; American Bankers Association; American Financial Services Association; Consumer Bankers Association; Delaware Bankers Association; Maryland Bankers Association; North Carolina Bankers Association; South Carolina Bankers Association; Virginia Bankers Association; Il-**

linois Commissioner of Banks and Trust Companies; Delaware State Bank Commissioner; State of Ohio; Commissioner of the Nevada Division of Financial Institutions; Commissioner of Financial Institutions of the State of Utah; South Carolina Department of Consumer Affairs, Amici Curiae.

No. 93–2555.

United States Court of Appeals, Fourth Circuit.

Argued June 7, 1994.

Decided Dec. 30, 1994.

**ARGUED:** George Grice Reaves, Reaves & Moore, Florence, SC, for appellant. Jeffrey S. Saltz, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, for appellees. **ON BRIEF:** Benjamin D. Moore, Reaves & Moore, Florence, SC; John B. Long, Dye, Tucker, Everitt, Wheale & Long, Augusta, GA, for appellant. Alan S. Kaplinsky, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA; Thornwell F. Sowell, J. Calhoun Watson, Barbara E. Brunson, Nelson, Mullins, Riley & Scarborough, Columbia, SC; N. Louise Ellingsworth, Smith, Gill, Fisher & Butts, Kansas City, MO; Wheeler Neff, Asst. Gen. Counsel, Beneficial Corp., Wilmington, DE, for appellees. Darrell L. Dreher, Steven T. Catlett, Charles M. Oellermann, Jones, Day, Reavis & Pogue, Columbus, OH, for amici curiae, Tennessee Department of Financial Institutions; Director of Banking of South Dakota; Arizona Superintendent of Banks.

Before HAMILTON, Circuit Judge, BUTZNER, Senior Circuit Judge, and GARBIS, United States District Judge for the District of Maryland, sitting by designation.

Affirmed by published opinion. Senior Judge BUTZNER wrote the opinion, in which Judge HAMILTON and Judge GARBIS joined.

## OPINION

BUTZNER, Senior Circuit Judge:

Benjamin F. Cades appeals district court orders denying his motion to remand his complaint to state court and granting defendants H & R Block and Beneficial National Bank summary judgment. We affirm.

### I

This action arose in connection with a financial service known as a refund anticipation loan (RAL), which enables a consumer to borrow funds on a short-term demand basis in the amount of the consumer's expected federal income tax refund. Block, like many tax services, offers its customers an electronic filing and rapid refund program. In connection with the rapid refund program, Beneficial agreed to loan qualified Block customers the amount of the taxpayer's expected refund, less a flat finance charge of $29.

On February 1, 1991, in the course of processing Cades's 1990 federal tax returns, a Block representative orally explained to Cades the terms of Beneficial's RAL. He informed Cades that Beneficial charged a $29 financing fee. In addition, he explained that Block charged either $25 or $35 for electronic filing. For $25 plus the $29 finance charge, a taxpayer would receive his federal income tax refund less charges from Beneficial and Block in eight days; for $35 plus the finance charge, the net refund would arrive in two days. Cades chose the latter option.

The Block representative gave Cades Beneficial's RAL application. The Block representative entered Cades's credit and other information on the application, and Cades signed it. By signing, Cades transferred to Beneficial his interest in his tax refund to the extent of his RAL. Cades also signed Internal Revenue Service Form 8453, the Federal Income Tax Declaration for Electronic Filing. He requested on this form that his federal income tax refund be directly deposited into an account in his name at Beneficial.

Block submitted the application to Beneficial's office in Delaware for approval by Beneficial.

Beneficial approved the loan, and on February 3, 1991, it transmitted to Block's offices a cashier's check in the amount of $1145, representing Cades's federal income tax refund of $1234, minus $89 in charges. On the reverse of the check and on an attached stub were the terms of the loan agreement. The agreement provided, in part: "By endorsing this check above, you promise to pay us on demand the amount set forth in the 'Total of Payments' section on the attached check stub." The stub stated that the annual percentage rate on the loan was 2.406 percent. Cades endorsed the check.

Beneficial is a national bank with chartered address and headquarters in Delaware. Block is a Missouri corporation with retail offices and franchisees nationwide. No corporate affiliation exists between Beneficial and Block.

Cades brought suit against Block and Beneficial in the South Carolina Court of Common Pleas, alleging that the fees charged by them violated numerous provisions of the South Carolina Consumer Protection Code and the South Carolina Unfair and Deceptive Trade Practices Act. He asked the court to certify a class action, and sought treble actual damages (in the amount of the electronic filing fee and finance charge), punitive damages, and attorneys' fees.

The defendants filed a timely notice of removal to federal court under 28 U.S.C. § 1446(a), alleging diversity jurisdiction under 28 U.S.C. § 1332. Cades moved to remand to state court. The defendants amended their notice of removal to allege federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337. Cades responded to this amended notice nearly three months later. The district court denied his motion to remand. Cades then amended his complaint to allege violations of the National Bank Act, 12 U.S.C. § 86, and the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* The district court granted summary judgment to the defendants on all counts in Cades's amended complaint.

## II

■ Cades contends that the district court improperly assumed removal jurisdiction. He asserts that although the parties are of diverse citizenship, the requisite amount in controversy is lacking.

We need not address Cades's concern about the amount in controversy, for it is clear that after Cades amended his complaint to charge violations of the National Bank Act and the Truth in Lending Act, federal jurisdiction appeared on the face of his amended complaint. Had the action set forth in the amended complaint been brought initially in federal court, the district court would have had original jurisdiction. *See Burns v. American Nat'l Bank and Trust Co.*, 479 F.2d 26, 29–30 (8th Cir.1973) (National Bank Act); 15 U.S.C. § 1640(e) (Truth in Lending Act). At the time the district court decided the case on its merits and entered final judgment, federal jurisdiction was firmly established. In *American Fire & Casualty Co. v. Finn*, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951), the Court explained that an initial lack of the right to removal may be cured when the final posture of the case does not wrongfully extend federal jurisdiction:

> There are cases which uphold judgments in the district courts even though there was no right to removal. In those cases the federal trial court would have had original jurisdiction of the controversy had it been brought in the federal court in the posture it had at the time of the actual trial of the cause or of the entry of the judgment. That is, if the litigation had been initiated in the federal court on the issues and between the parties that comprised the case at the time of trial or judgment, the federal court would have had cognizance of the case.

341 U.S. at 16, 71 S.Ct. at 541 (citation omitted); *accord Able v. Upjohn Co.*, 829 F.2d 1330, 1333 (4th Cir.1987).

■ Cades protests that the defendants' amended notice of removal specifying federal question jurisdiction was untimely and that the district court improperly considered it.

■ A motion to remand the case because of a defect in removal procedure must be made within 30 days after filing the notice of removal. 28 U.S.C. § 1447(c). An untimely removal is a defect in removal procedure. Comment on the 1988 Revision of section 1447 following 28 U.S.C.A. § 1447 (West 1994).

Cades did not object to the amended notice of removal until nearly three months after the defendants filed the amended notice. We agree with the district court that, even assuming the amended notice of removal was filed late, Cades's objection was untimely.

## III

■ Title 12 U.S.C. § 85 authorizes a national bank to charge interest at rates permitted by the laws of the state in which the bank is located. The district court found that Beneficial was located in Delaware and ruled that its $29 finance charge complied with Delaware law. Cades assigns errors to these rulings.

In *Marquette Nat'l Bank of Minneapolis v. First of Omaha Service Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978), the Supreme Court held that, even though a national bank solicited credit card customers through agents in another state, it was authorized to charge interest on card indebtedness at the rate allowed by the state where it was located. Beneficial and Block contend that section 85 as applied in *Marquette* governs this case. Cades attempts to distinguish *Marquette* from the present case. Essentially, he asserts that in *Marquette*, cards were issued, credit was advanced, and finance charges were assessed in the national bank's home state. He argues that in this case, by contrast, the loan transaction occurred in South Carolina: he signed all the relevant documents there; he had face-to-face dealings with Block representatives relating to his loan there; and finance charges were assessed there.

These asserted distinctions are not convincing. It is undisputed that the loan was approved in Beneficial's Delaware office, not in South Carolina. The loan proceeds originated in Delaware and were later transmitted to South Carolina. Both *Marquette* and this case involve face-to-face solicitation of

out of state consumers by agents of a national bank. In both instances, the interest rate a national bank may charge is governed by section 85, which looks to the interest rates allowed by the state where the bank is located—not where the borrower is located or where the loan transaction may be said to have occurred.

■ Cades next insists that we should read section 85 in the context of the National Bank Act's provisions prohibiting branch banking by national banks. He argues that under 12 U.S.C. § 81, a national bank may transact business only in the state in which it is located. He contends that Beneficial's RAL was made in Block's South Carolina office and that office therefore constitutes a "branch office" of Beneficial, as defined in 12 U.S.C. § 36(f). Beneficial's unlawful branch activities in South Carolina, he concludes, are outside the preemptive protection of section 85 and must comply with South Carolina's usury laws.

■ This argument is flawed. As the district court noted, courts apply a two-part test to decide whether a bank is operating a branch office. First, the court determines whether a branch is "establish[ed] and operate[d]" by the bank under section 36(c). If a branch is found to exist, the court then asks whether the branch office is transacting branch business under section 36(f) by accepting deposits, paying checks, or lending money. *See Independent Bankers Ass'n of New York v. Marine Midland Bank,* 757 F.2d 453, 456–63 (2d Cir.1985); *cf. Independent Bankers Ass'n of America v. Smith,* 534 F.2d 921, 951–52 (D.C.Cir.1976).

The district court correctly held that the relationship of Beneficial and Block fails the first part of the test for identifying a branch office. Beneficial has no ownership or leasehold interest in Block's South Carolina offices. No Beneficial employees work in Block's offices. Beneficial exercises no authority or control over Block's employees or methods of operation. Therefore, Block's South Carolina offices are not branch offices established and operated by Beneficial. Quite properly the district court did not need to reach the second part of the test. Cades's

argument that South Carolina's usury laws apply in this case therefore fails.

■ The next question is whether Delaware law permitted Beneficial to charge Cades a $29 financing fee. Delaware Code Ann. tit. 5, § 965 (1993) states:

[I]n lieu of periodic interest ... a bank may charge and collect, as interest, in respect of a loan ... [l]oan fees, points, finders fees and other front-end and periodic charges; provided, however, that in the case of a loan to an individual borrower, no such front-end or periodic charge may be charged and collected unless the agreement governing, or the bond, note, or other evidence of, the loan so provides....

The documents relating to Cades's transaction expressly provide for the collection of a $29 finance charge. The district court correctly ruled that the finance charge collected by Beneficial complied with Delaware law and 12 U.S.C. § 85.

We note the arguments of Cades and amici supporting him that upholding the district court on this issue will erode state sovereignty in the area of consumer lending and emasculate state usury laws. The Supreme Court considered and rejected a similar argument in *Marquette:*

Petitioners' final argument is that the "exportation" of interest rates, such as occurred in this case, will significantly impair the ability of States to enact effective usury laws. This impairment, however, has always been implicit in the structure of the National Bank Act, since citizens of one State were free to visit a neighboring State to receive credit at foreign interest rates.... [T]he protection of state usury laws is an issue of legislative policy, and any plea to alter § 85 to further that end is better addressed to the wisdom of Congress than to the judgment of this Court.

439 U.S. at 318–19, 99 S.Ct. at 550–51.

## IV

■ Cades raises two claims under the Truth in Lending Act. First, he alleges that Beneficial understated the annual percentage rate (APR) on his loan. He contends that Beneficial violated the Act's requirement that

a creditor disclose to the consumer the finance charge, expressed as an annual percentage rate. *See* 15 U.S.C. § 1638(a)(4).

The Act provides that no creditor can be held liable for any act done or omitted in good faith conformity with any rule, regulation, or interpretation by the Federal Reserve Board. 15 U.S.C. § 1640(f); *see Warren v. Creditthrift of America, Inc.*, 599 F.2d 829, 831–32 (7th Cir. 1979). Pursuant to its authority under section 1604, the Federal Reserve Board has adopted Regulation Z, 12 C.F.R. pt. 226 (1993), to implement the Act. The Board has also issued the Official Staff Commentary to Regulation Z and the Act. The regulations and staff commentary are "dispositive" unless "demonstrably irrational." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980).

The maturity date and corresponding APR of a loan depend on whether the loan is payable on demand or at a specified time. Section 226.17(c)(5) of Regulation Z reads: "If an obligation is payable on demand, the creditor shall make the disclosures based on an assumed maturity of 1 year. If an alternate maturity date is stated in the legal obligation between the parties, the disclosures shall be based on that date." The disclosures, contained on a stub attached to Beneficial's loan check, describe the loan as payable "on demand." No other language relating to the loan's maturity date appears on the loan application, check, or attached stub.

Cades argues that his agreement with Beneficial did not give rise to a true demand obligation. Beneficial's usual practice, he contends, was to collect on an outstanding RAL as soon as the IRS deposited the consumer's tax refund into its account. He points out that IRS Form 8453, to which the loan application refers, states that refunds should arrive within two to three weeks after filing. He concludes that the APR should have been based on the "alternate maturity date" of two to three weeks estimated in Form 8453. Had Beneficial calculated its loan rate based on a three week maturity period, the APR would be about 17 times the stated rate of 2.406 percent.

The Official Commentary to Regulation Z explains that the terms of the obligation are to be found in the wording of the loan documents: "Disclosures for demand obligations are based on an assumed 1–year term, unless an alternate maturity date is stated in the legal obligation." 12 C.F.R. pt. 226, Supp. I, comment 17(c)(5)–1. Further, section 226.17(c)(1) emphasizes that the disclosures required depend only on the terms of the parties' legal obligations, not on the prevailing practice of a creditor. It provides: "The disclosures shall reflect the terms of the legal obligation between the parties." This precept is amplified by 12 C.F.R. pt. 226, Supp. I, comment 17(c)(1)–17, which recognizes that in accordance with the terms of the legal obligation, a creditor may either require payment of an RAL on demand or require payment when the refund is made. The comment explains that to determine when repayment is required, one must look to the terms of the legal obligation between the parties.

Form 8453 says nothing about when the RAL is payable. It merely provides taxpayers an estimate of when refund checks will arrive. Nor does the loan agreement anywhere provide that the RAL is payable immediately after the IRS deposits the refund into the account at Beneficial. The agreement between Cades and Beneficial is, by its terms, a demand obligation. Beneficial properly based the APR of the loan on a maturity date of one year. The district court correctly granted summary judgment on this claim.

■ In Cades's second Truth in Lending Act claim, he alleges that Beneficial failed to provide him with the necessary disclosures in a timely manner. Cades does not dispute that the disclosures were attached to the cashier's check he signed on February 3. Rather, he contends that Beneficial should have provided the disclosures on February 1, the day he signed the loan application. He argues that the assignment of his tax refund to Beneficial was irrevocable on February 1 and that Beneficial obtained a security interest in the tax refund proceeds on February 1. He asserts that the transaction was consummated on February 1 rather than on February 3.

Cades argues that the purpose of the Act, to give consumers a meaningful opportunity to shop for credit, requires that disclosures in RAL transactions be given at the time of application, rather than immediately before the consumer endorses his loan check. He points out that the Act is intended to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available." 15 U.S.C. § 1601(a).

The Act requires a creditor to make the required disclosures "before credit is extended." 15 U.S.C. § 1638(b)(1). Section 226.17(b) of Regulation Z states: "The creditor shall make disclosures before consummation of the transaction." Regulation Z defines consummation as "the time that a consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 226.2(a)(13). In *Murphy v. Empire of America*, 746 F.2d 931, 934 (2d Cir.1984), the court stated: "The transaction is consummated when the lender and borrower sign a contract obligating them, respectively, to lend and to borrow the funds." The Official Commentary states that whether a contract exists is "to be determined under applicable law." 12 C.F.R. pt. 226, Supp. I, comment 2(a)(13).

The loan application signed by Cades does not commit him to borrow funds from Beneficial. It states that it is being submitted "for the purpose of enabling [Beneficial] to determine whether or not to make a Refund Anticipation Loan" to the applicant. Under both Delaware and South Carolina law, Beneficial's security interest in Cades's tax refund was unenforceable until Cades endorsed his loan check on February 3, because Beneficial had given no value to Cades until that time. *See* Del.Code Ann. tit. 6, § 9–203(1)(b) (1993); S.C.Code Ann. § 36–9–203(1)(b) (1993).

Cades provides no authority to support his claim that the loan transaction was consummated at the time he signed the loan application, or that the broad purposes of the Act should override its specific provisions. In *Bissette v. Colonial Mortgage Corp. of D.C.*, 477 F.2d 1245 (D.C.Cir.1973), the court held that a mortgagee bank was not required to make Truth in Lending Act disclosures to the borrowers until closing. It rejected the borrowers' argument that statutory policy required earlier disclosure, stating that the language of the statute and regulations was clear. 477 F.2d at 1247. *Accord Waters v. Weyerhaeuser Mortgage Co.*, 582 F.2d 503, 505 (9th Cir.1978).

■ In holding that the transaction was not consummated until February 3, we reject Cades's argument that his irrevocable assignment of his tax refund to his account at Beneficial, through his direct deposit election on IRS Form 8453, effectively transferred all his rights in the refund to Beneficial. Funds in a depositor's account, absent an agreement to the contrary, represent a debt by the bank to the depositor and may be withdrawn by the depositor upon demand. *See Bank of Marin v. England*, 385 U.S. 99, 101, 87 S.Ct. 274, 276, 17 L.Ed.2d 197 (1966).

Beneficial did not become entitled to apply the deposited funds to Cades's loan until Cades endorsed his loan check on February 3. Because Beneficial provided the required disclosures to Cades before the loan was consummated by his endorsement of Beneficial's check, the district court correctly granted summary judgment on this claim.

V

We need not consider Cades's state law claims because he did not argue them in his briefs. *See United States v. Williams*, 378 F.2d 665, 666 (4th Cir.1967).

*AFFIRMED.*